PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VIRGINIA ANDERSON,
               *Plaintiff-Appellant,*

and

SHERMAN T. LOTT; VERNELLE
PAYTON; LARRY COLEMAN; AVA
HAWKINS; CURTIS YOUNG; CLINTON
EDWARDS, JR.; FRANCIS H. NEWMAN,
JR.; SAMUEL QUILLER; PAMELA WADE;
BENNIE BREELAND; GLENN
STEPHENSON; KENNETH L. BRADY,
SR.; CLYDE REED; ROBIN HOLMAN;
JOHN L. NAYLOR; GWENDOLYN H.
WATTS; ALTON BARNES; HAYWARD
ERVIN; ALANA J. LEWIS; DEBRA A.
WILLIAMS; JIMMIE LEE TURNER;
WILLIAM BONAPARTE, JR.; JEFFREY A.
MYERS; JOHNNY J. HOLMES; JAMES
SHERMAN, III; DEBBIE S.G. POPE;
CHARLES JONES; ANNIE B. LOTT-
ABNEY; OLIVIA G. GAVIN; DIANE J.
CRAWFORD; MAXINE S. WHITE;
MARVIN MOORE; BERTHA LEGREE;
IRMAGENE REED; WILLAR H.
HIGHTOWER, JR.; JEFFREY A. BAILEY;
CONSTANCE DORSEY; RYSON CARTER;
RHONDA M. TILLER; PEGGY M.
POLLOCK; CALVIN L. COOKS; GLORIA
J. COLLINS; DANITA L. MYLER;
PATRICIA LANGFORD; DELORES
BEASLEY; MARY L. JOHNSON;

No. 03-1150

MOSES MYERS; BENITA BASS; LINCHIE H. SIMMONS; WALTER DAISE; WANDA Y. SMITH; BERNARD NORA; CAROLYN W. THORPE; TOMMY A. CAMPBELL; DONALD F. BROOKS; LEWIS HOLSTON; DEITRA M. POUGH; ANGELA Y. HOLBROOK; PHYLLIS A. CALHOUN-HURLEY; NORRIS V. ROUSE; URSULA D. GAY-FURSE; DEBRA GANTT; ELVIRA JOHNSON; WILLIAM R. HALL; SHARON M. CAMPBELL; WINSTON BUTLER; QUITMAN WHITE; LEON BAKER; LINDA B. BAKER; GEORGE BUSH; GARY L. CARTER; CURTIS COKER, JR.; DIANNE T. DAVIS; SANDRA HARRISON; CHARLOTTE JOHNSON; TYRONE DAVIS; MARINDA B. JOHNSON; JOHNNY KING; DELORES MARTIN; CLINTON L. MCCALLA; DOUGLAS MCKENZIE; MARILYN MCKIE; MARLENE L. MOORE; JAMES MOTON; GOLDIE S. RANDLE; THOMAS WILLIAMS; JOSEPH RIDEAUX; WILLIAM L. RYANS; DIANNE S. SCOTT; VERONICA SHAW; MICHAEL STALEY; CALVIN R. SUBER; GEORGE A. TAYLOR; ELLEN M. VESSEL; KENNETH E. VINSON; HOPE YARBOROUGH, for themselves and on behalf of all others similarly situated,

*Plaintiffs,*

v.

WESTINGHOUSE SAVANNAH RIVER
COMPANY; THE BABCOCK & WILCOX
SAVANNAH RIVER COMPANY,
INCORPORATED; BRITISH NUCLEAR
FUELS LIMITED SAVANNAH RIVER
CORPORATION; BECHTEL SAVANNAH
RIVER, INCORPORATED,
*Defendants-Appellees.*

NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.,
*Amicus Supporting Appellant,*

EQUAL EMPLOYMENT ADVISORY
COUNCIL; CHAMBER OF COMMERCE,
*Amici Supporting Appellee.*

Virginia Anderson,
                    *Plaintiff-Appellant,*

                    v.

Westinghouse Savannah River
Company
                    *Defendant-Appellee,*

                    and

Bechtel Savannah River,
Incorporated; The Babcock &
Wilcox Savannah River Company,
Incorporated; British Nuclear
Fuels Limited Savannah River
Corporation,
                    *Defendants.*

NAACP Legal Defense and
Education Fund, Inc.,
        *Amicus Supporting Appellant,*

Equal Employment Advisory
Council; Chamber of Commerce,
        *Amici Supporting Appellee.*

No. 03-1151

Appeals from the United States District Court
for the District of South Carolina, at Aiken.
Cameron McGowan Currie, District Judge.
(CA-98-2075-1-23-BC; CA-00-1667-1-23-BC)

Argued: October 29, 2003

Decided: May 4, 2005

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Widener wrote the opinion. Judge Niemeyer wrote a separate opinion concurring in part and dissenting in part. Judge Gregory wrote a separate opinion dissenting in part.

---

**COUNSEL**

**ARGUED:** Ivan D. Smith, VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C., New York, New York, for Appellant. Glen David Nager, JONES DAY, Washington, D.C., for Appellees. **ON BRIEF:** Julian R. Birnbaum, VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C., New York, New York; Ray P. McClain, RAY P. MCCLAIN, ATTORNEY, P.A., Charleston, South Carolina; BROWN & MULRAIN, L.L.P., New York, New York, for Appellant. Deborah A. Sudbury, Douglas M. Towns, JONES DAY, Atlanta, Georgia; Shay Dvoretzky, JONES DAY, New York, New York; Kenneth E. Young, NELSON, MULLINS, RILEY & SCARBOROUGH, Greenville, South Carolina, for Appellees. Elaine R. Jones, Director-Counsel, Norman J. Chachkin, Robert H. Stroup, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., New York, New York, for Amicus Curiae NAACP. Stephen A. Bokat, Robin S. Conrad, Ellen Dunham Bryant, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C.; Ann Elizabeth Reesman, Katherine Y.K. Cheung, MCGUINESS, NORRIS & WILLIAMS, L.L.P., Washington, D.C., for Amici Curiae Council and Chamber.

---

**OPINION**

WIDENER, Circuit Judge:

In this Title VII case, plaintiff Virginia Anderson appeals from the district court's orders denying class certification, granting the defendants' motions in limine, and granting summary judgment to the defendants. We generally affirm the district court, but remand for consideration of whether class should be certified with a new lead plaintiff.

I.

Virginia Anderson is a black female employed at the Department of Energy's Savannah River Site. The Savannah River Site is managed for the Department of Energy by Westinghouse Savannah River Company, LLC (Westinghouse). Bechtel Savannah River, Inc., (Bechtel), Babcox & Wilcox Savannah River Company (B & W), and British Nuclear Fuels Ltd. Savannah River Corporation (BNFL) also participate in the management of the Savannah River Site pursuant to a contract with the Department of Energy. Each company is a defendant in this action.

In the past, the Savannah River Site produced materials needed for the fabrication of nuclear weapons, but its current mission is focused on environmental cleanup and processing radioactive materials. The Savannah River Site covers 310 square miles in western South Carolina, and, in 1999, over 13,000 employees worked at the sites for the four defendants. Of those employees, 2765 were black.

Virginia Anderson began working at the Savannah River Site in 1978 as a typist in a typing pool. Miss Anderson became a stenographer a year later. She worked as a stenographer in several different departments at the Savannah River Site until 1989. In 1989, Miss Anderson became an administrative secretary in the materials technology group. The transition from stenographer to administrative secretary was a promotion for Miss Anderson, and, as an administrative secretary, she had more responsibilities. As an administrative secretary, Miss Anderson received a salary at the SGL 16 level. Miss Anderson remained with the materials technology group until July of 1998. In August of 1998, she received a promotion to administrative assistant in the university relations group within the chemicals hydrogen technology group. With her promotion, Miss Anderson's salary level increased to SGL 28 SOP. SOP stands for selective overtime positions, and, as a SGL 28 SOP employee, Miss Anderson received additional compensation above her salary if she worked a certain number of hours above her normal working hours. Miss Anderson remained with the university relations group through the time she filed her lawsuit against the defendants.

When she began working at the Savannah River Site, Miss Anderson's higher educational background was limited to an executive sec-

retary diploma from Augusta Tech, which she received in 1977. During her tenure at the Savannah River Site, Miss Anderson pursued further higher education degrees. In 1996, Miss Anderson took her bachelor of science degree in human resources management from Southern Wesleyan University. In June of 1998, Miss Anderson received her masters in business administration from Nova Southeastern University. Miss Anderson's promotion from administrative secretary, with a pay level of SGL 16, to administrative assistant, with a pay level of SGL 28 SOP, came just months after she received her M.B.A.

In the 1990's, the Savannah River Site instituted two programs, one for promotions and one for merit pay increases, that are at issue in this litigation. The first is the Competency Based Posting System, or CBPS. The Competency Based System is an application and promotion system which Savannah River Site employees may use to apply for new positions and promotions. Under the system, exempt or non-exempt employees may apply for any posted position that is available, with a few exceptions. According to the description contained in Westinghouse Savannah River Company 5B Manual, the hiring and promotion process under the Competency Based System is as follows:

1. Open position is submitted to HR for posting.

   The hiring manager ensures the position description is complete and correct; adding, and weighing the values of, necessary competencies. HR Compensation establishes the salary grade of the position at or below the salary grade of the previous incumbent (if any). No preferred candidates exist in this system.

2. HR posts the position in ShRINE (sic) for ten working days.

3. The hiring manager establishes an interview panel.

   With the HR lead, the hiring manager selects appropriate individuals, based on their job knowledge and familiarity with the position, to sit on an interview

panel. The panel consists of three members, one of whom must always be the hiring manager.

4.  Self-nominating individuals submit their qualifications to HR-Staffing.

    Submitted qualifications can include a Personal History form (OSR 27-13) and/or resume.

5.  Individuals nominated by others submit their qualifications to HR-Staffing.

    With their consent, candidates can be nominated by others. Nominations are not restricted to managers. The hiring manager cannot nominate. Candidates submit a Personal History form (OSR 27-13) or resume and copies of their last three performance appraisals to HR-Staffing.

6.  HR confirms that applicants meet posted position requirements.

    Eligible candidates are identified based on minimum requirements listed in the position profile.

7.  HR-Equal Employment Opportunities (EEO) reviews the list of applicants for consistency with corporate and affirmative action planning.

8.  HR-Staffing submits eligible applicants to the hiring manager.

9.  Within five working days of receiving the material from HR-Staffing, the hiring manager selects candidates for interviews.

10. All applicants are informed of the status of their application.

11. Individuals selected for an interview receive a candidate information package regarding the interview process.

12. The hiring manager schedules and conducts, with the panel, interviews within 10 working days after candidates are notified of their status.

13. The hiring manager selects the candidate who best meets position requirements.

    The final decision is made by the hiring manager with input from the other two interview panel members and after review by the HR lead. The next level of management must also review and approve the selected candidate.

14. HR-EEO review candidate selection for consistency with corporate and affirmative action planning.

15. If a promotion is necessary, HR-Compensation, HR-EEO, and the division HR lead review the decision to ensure that all relevant criteria are met.

16. HR-Staffing prepares a formal offer and the hiring manager extends the offer to the candidate.

17. The candidate accepts or rejects the offer within two calendar days.

18. The hiring manager informs all interviewed candidates and the sending manager of the selected candidate of the selection process outcome.

19. The selected candidate is released to the new position within four weeks of acceptance.

    If the releasing manager and the hiring manager both agree, the release time-frame can be shortened. The release time-frame cannot exceed four weeks.

Under the Competency Based System, hiring managers can evaluate applicants in six core competencies: teamwork, leadership, communications, business results, self-management, and employee development. The hiring managers can also evaluate applicants using selected functional competencies that are specific to the position for which the manager is hiring. For example, a particular functional competency could be "[p]roficient in heating, ventilation and air-conditioning design," and the CBPS manual explains that "[f]unctional competencies can be derived from the responsibility section on the job description." Each competency is assigned a weight, using a number from one to five, in which five is "[m]ost important relative to other competencies" and one is "[l]east important relative to other competencies." The interview panel then selects candidates for interviews and then interviews each selected candidate.

Each applicant who is interviewed is evaluated by the interview panel using the core and functional competencies. The interview panel determines a weighted score for each applicant on each core and functional competency. The panel determines the weighted score by multiplying the weight given to each competency (one to five) by the applicant's rating for each competency. The panel rates the applicant on a scale of one to five, with a five meaning "[d]emonstrates exceptional competence" and a one meaning "[d]id not demonstrate expected level of competence." The panel determines the applicant's total weighted score by adding together the weighted scores for each competency. The hiring manager then selects the candidate for the position, after noting the total weighted scores for each candidate, and records the basis for selecting the chosen candidate.

The second program instituted at the Savannah River Site was the Ranked Performance Pay Process, or RP3. The Site began using the program in 1997 to rank exempt and selected overtime position employees for merit increases in salary. Two major factors are utilized under the RP3 system to determine which employees should receive merit raises. Job performance constitutes 75% of the ranking given to an employee, and the remaining 25% is derived from rankings on Site Imperatives. Site Imperatives "are the basis of how we [Site employees] each are expected to accomplish the business objectives of our work group, division, and company as a whole." The five Site Imperatives are safety, disciplined operations, cost effectiveness,

continuous improvement, and teamwork. Each Site Imperative is weighted five percent in the total ranking, with the total for all five constituting 25% of an employee's final ranking.

Under the RP3 system, each manager must use the RP3 electronic evaluation worksheet to rate each employee in the manager's organization. The evaluation process begins with the smallest unit of organization, the department or section. Once the initial rankings are computed for the department or section, all employees within a single work group are ranked by the next level of management. At the next step, the rankings for a division, each division's manager may integrate the work group rankings to achieve a ranking of employees within the division. The division manager may rank all employees in various combinations. Among the combinations suggested by the RP3 system manual are (1) total ranking of all employees; (2) rank within separate work groups; (3) managers, leads, and professionals; (4) salary grade clusters, i.e., all SGL 16 employees or all SGL 32 to 34 employees; or (5) managers, leads, and professionals by salary grade clusters.

The employee rankings for each division are then broken into performance categories consisting of the high 15%, the middle 80%, and the low five percent. Final rankings are approved by the division manager, and merit salary increases are awarded based on each division's budget and salary guidechart. The Human Resources Compensation department must approve any merit increases that are outside of the salary guidechart. All employees, regardless of their ranking percentage, are eligible for merit increases, but the top 15% may receive the highest merit increases. Another factor that contributes to the size of a merit increase is whether the employee is above or below the midpoint of their salary grade. For example, if an employee is an A performer whose salary level is below the midpoint of his salary grade, he is eligible to receive a merit increase, the amount of which may be different if he is an A performer whose salary level is above the midpoint of his salary grade.

In ranking their employees for job performance, which accounts for 75% of an employee's ranking, the RP3 manual instructs managers to consider the following factors:

Job expectations
Quality and quantity of work
Position scope (performance against position description)
Support to achieving commitments
Feedback from others (managers, peers, or customers)
Awards, recognition
Performance standards (leadership, judgment)

For job performance, an employee receives a rating of either "Low," meaning "[c]onsistently performs at a level below expectations," or "Mid," meaning "[c]onsistently performs at the level of expectations," or "High, " meaning "consistently performs at a level that exceeds expectations." Managers also use the low, mid, or high rankings to evaluate their employees in the five Site Imperatives. The RP3 manual lists the performance indicators that managers should use when determining whether an employee should receive a low, mid, or high rank for each imperative.

In her lawsuit, Miss Anderson complains about three separate instances in which she sought and subsequently failed to receive a promotion. In 1997, Miss Anderson applied for the position of Administrative Assistant in the Environmental Restoration Division. The hiring manager, Miss Gail Toddings, posted the opening using the CBPS, and approximately 150 employees applied for the position. After the Site's Human Resources department evaluated the applications, 30 to 40 resumes were sent to Miss Toddings. The outgoing administrative assistant, Miss Laboris Curry, assisted Miss Toddings in evaluating the resumes and choosing 15 people to interview. Miss Toddings made the final decision on who would be interviewed. Miss Anderson was selected for an interview, and she interviewed for the position on December 15, 1997, before an interview panel chaired by Miss Toddings. The interview panel recommended and Miss Toddings selected Mrs. Linda Clarke for the position. Mrs. Clarke, a white woman, received the highest consensus rating, a score of 190, among all of the employees who were interviewed.[1] Miss Anderson received

_____

[1]190 was the highest rating among the employees interviewed for the position. Mrs. Clarke and another employee, Miss Shirley King, both received scores of 190. (JA 11107-11108, 11115-11116) Miss King is a white woman. (JA 11169)

a rating score of 136, the second-lowest score given by the interview panel. The interview panel gave its lowest rating score of 129.5 to a white female employee.

In 1998, Miss Anderson applied for the position of Administrative Assistant in the Business Development and Community Outreach Division. Miss Anderson was not selected for an interview on the basis of her low scores for the functional competencies of the position. Only two applicants received higher scores in core competencies than Miss Anderson, but eight applicants had higher ratings in the functional competencies. Miss Anderson received a rating of 59 out of a possible 72 for core competencies and a rating of 9 out of a possible 57 for functional competencies, for a total rating of 68. In contrast, the individual chosen for the promotion, Mrs. Brenda Pearson (formerly Miss Brenda Boggs), a white woman, received a rating of 60 out of a possible 72 for core competencies and a rating of 57 out of a possible 57 for functional competencies, for a total rating of 117. Mrs. Pearson received the promotion, and Miss Anderson did not.

Miss Anderson also alleges that she was denied a promotion from SGL 28 SOP to SGL 30 while in her position as administrative assistant in the university relations group. She complains that she was told she had to work in her current position for two to four years before she could receive a promotion in place. She contends that white employees received promotions in place without having to work in their positions for two to four years.

II.

This lawsuit began on October 31, 1997, when ten black Site employees filed a class action lawsuit against the defendants. The ten plaintiffs brought claims under 42 U.S.C. § 1981 and Title VII alleging that the defendants denied black employees promotions on an equal basis with white employees, maintained salary discrepancies between black and white employees, denied black employees access to training opportunities on an equal basis with white employees, demoted black employees on the basis of their race, and discriminated against black employees by keeping them in less desirable positions. The ten plaintiffs also brought individual claims for disparate treat-

ment on the basis of race. Miss Anderson later joined the lawsuit as a plaintiff, and a total of 99 individuals became plaintiffs.

The plaintiffs sought to certify a class consisting of all current and former black employees of the defendants who worked at the Site who had been or will be subject to discrimination by the defendants. After oral argument was held on the class certification motion, the district court denied the motion "as to the proposed class or any sub-class suggested by Plaintiffs." The district court determined that the plaintiffs' "across the board" challenges to the defendants' employee practices did not satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure and were not supported by governing Supreme Court and Fourth Circuit case law.

After denying the plaintiffs' motion for class certification, the district court ordered the plaintiffs to pursue their claims individually. Following the district court's instruction, Miss Anderson filed an amended complaint on July 26, 2000. In her complaint, she brings claims for disparate impact discrimination, relating to the defendants' use of the CBPS and RP3 systems and to the defendants' pay practices, and claims for disparate treatment, relating to the three promotions she did not receive.

The district court held an evidentiary hearing after ruling on the motions for class certification. At issue in the hearing was the proposed testimony of Dr. Edwin L. Bradley, the plaintiff's prospective expert witness. After listening to testimony and argument, the district court excluded from evidence Dr. Bradley's proposed expert opinion testimony on the discriminatory impact of the RP3 system. The district court excluded this testimony on the grounds that it was based on statistical research and analysis that did not have proper controls. Dr. Bradley had conducted several studies regarding the RP3 system. In several instances, Dr. Bradley's statistical analysis compared black and white employees under the RP3 ranking system without taking into account any differences in their job titles or position. The district court also excluded from evidence a draft copy of an assessment of Westinghouse's equal employment opportunity, human resources, and employee concerns programs conducted by the Department of Energy.

The district court granted the defendants' motion for summary judgment as to Miss Anderson's individual disparate impact and disparate treatment claims. The district court denied the defendants' motion for summary judgment as to Miss Anderson's disparate treatment pay claim, but Miss Anderson had the remaining claim dismissed with prejudice so that she could pursue this appeal.

### III.

We review the district court's grant of summary judgment to the defendants de novo, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to Anderson. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). Summary judgment should only be granted when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Walton v. Greenbriar Ford, Inc.*, 370 F.3d 446, 449 (4th Cir. 2004).

### IV.

The district court denied the motion for class certification on July 19, 2000. In its order and opinion denying class certification, the district court directed the 99 plaintiffs to proceed with their cases on an individual basis. The district court found that

> not one single named Plaintiff in the proposed class asserts claims involving all of the programs attacked; rather, the pattern is one of combinations and permutations of some Plaintiffs on some claims and different combinations and permutations of Plaintiffs on other claims, etcetera.

Slip op. at 48. The district court cannot certify a class action in which the class representative is not part of the class and does not "'possess the same interest and suffer the same injury' as the class members." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (quoting *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

On appeal, Anderson argues that the district court should have certified two subclasses of black employees with disparate impact claims involving the Competency Based Posting System and the Ranked Performance Pay Process. In its opinion denying the plaintiffs' motion for class certification, the district court noted that the plaintiffs' proposed subclasses, if they had been raised in a timely fashion instead of as part of the plaintiffs' motion for reconsideration of the district court's ruling on class certification, would be denied because of the failure of the proposed classes to satisfy the requirements of commonality and typicality.

After denying the plaintiffs' motion for class certification, the district court held a hearing to consider evidentiary issues. At the conclusion of the hearing, the district court granted the defendants' motion to exclude the opinion of the plaintiffs' expert, Dr. Edwin L. Bradley, about the RP3 rankings and about merit increases under the RP3 system. Miss Anderson appeals from the district court's ruling on the admissibility of this evidence. We address these contentions first.

V.

We review a district court's decision to admit or exclude expert evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997). If the district court makes an error of law in deciding an evidentiary question, that error is "by definition an abuse of discretion." See *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 150 (4th Cir. 2002). In Daubert, the Supreme Court explained that the previous test for the admissibility of "novel scientific evidence" based on *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), was superseded by the adoption of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 585-589.

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1)

> the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. When a party seeks to admit any expert testimony, the district court's obligation is "gatekeeping." See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). As the gatekeeper, the district court should analyze the proposed expert testimony using several factors, including whether the expert opinion can be tested and whether it has been subjected to peer review. *Daubert*, 509 U.S. at 592-94. The district court should also consider the rate of error of the methods employed by the expert, the existence and maintenance of standards used in the expert's methods, and whether the expert's methods have been generally accepted by his or her respective community. *Daubert*, 509 U.S. at 594; see also *United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003) (listing *Daubert* factors to be applied in analyzing expert testimony).

Miss Anderson sought to introduce into evidence Dr. Bradley's testimony about the differences in RP3 ratings given to blacks as compared to those given to whites. The report upon which this testimony would be based showed that for the years 1998 and 1999 the number of standard deviations between the RP3 rankings given to black exempt employees and white exempt employees was -2.61 and -2.14, respectively. In making the comparisons, Dr. Bradley controlled the analysis using job groups. In other words, Dr. Bradley's analysis showed that, using the job groups as the category in which employees are grouped, that whites had higher RP3 rankings than blacks.[2] The district court found this analysis wanting.

---

[2]Dr. Bradley's testimony also would have relied on nine other studies that also failed to properly compare employees in similar job positions and titles. Several of Dr. Bradley's studies did not have any controls to ensure that the percentage of high RP3 rankings and merit increases awarded to African-Americans was not influenced by other factors or by comparing dissimilar employees. Other studies reviewing merit increases controlled for ranking received or for race and ranking but not for the actual factors that comprise the ranking or for the different job responsibilities that workers in different divisions may have. Five of Dr. Brad-

The district court found that "the studies are deficient because they use the EEO job groupings." During the hearing, Dr. Bradley testified that job groups could contain numerous and diverse occupations. For example, Dr. Bradley admitted under questioning that a single job group could contain 147 separate individual job titles and up to seven separate pay grades. Dr. Bradley also testified that a single job group could contain the following job titles: optician, counsel, physician, and psychologist. Furthermore, under the guidelines for managers using the RP3 system to rate employees, the managers are instructed that "[t]he single most important component of any employee's overall performance involves the completion of their individual job-related responsibilities. This factor is weighted 75% of the total evaluation." Those instructions also note that the "[r]equirements of each job are often unique - there is not a single standard by which all employees can be measured." According to Savannah River Site employment policies, the RP3 ranking system is to be utilized to determine merit raises for employees within a single division. In 1998 and 1999, the Savannah River Site had at least 18 separate divisions, and the RP3 system was to be used to rank employees for merit raises within, and not across, each division.

Dr. Bradley's studies utilized various controls, i.e. job group, job performance categories, division, EEO job category, adjusted years of service, FLSA group. The studies, however, failed to compare simi-

---

ley's studies involving RP3 rankings compared workers only by division, but, within a division, there are many distinct types of positions with different responsibilities.

In *Herold v. Hajoca Corp.*, 864 F.2d 317, 321-22 (4th Cir. 1988), we upheld the district court's ruling to exclude statistical evidence that did not compare the plaintiff with others who were similarly situated to the plaintiff. In *Herold*, plaintiff sought to introduce statistical evidence derived from the number of employees terminated in the company's entire mid-Atlantic region in order to establish a violation of the ADEA. We upheld the district court's refusal to allow such "region-wide statistics" to be admitted. Instead, the district court permitted the plaintiff to introduce statistical evidence derived only from the terminations of employees at the defendant's Staunton branch, where the plaintiff had been employed. 864 F.2d at 321-22.

larly situated workers at the Savannah River Site. In *Smith v. Virginia Commonwealth University*, 84 F.3d 672, 676-77 (4th Cir. 1996) (en banc), we noted that regression analysis utilized in the employment discrimination context "must include all the major factors" which influence the challenged action, such as ratings or pay. (emphasis in original). The plaintiffs in *Smith* were five male professors at Virginia Commonwealth University who brought a lawsuit under Title VII to challenge pay raises given to female faculty members after the university conducted a salary equity study. 84 F.3d at 674. In *Smith*, we reversed the district court's grant of summary judgment because the district court relied on regression analyses that failed to include all major factors that influence the salaries of professors. 84 F.3d at 676. We also explained that

> [a]lso at issue is the fact that the study included male faculty members who had returned from higher paying positions in the VCU administration but kept the higher salary. The study did not account for this salary differential. This, according to the appellants, leads to an illogical comparison involving an inflated pool of faculty members; eighty-five percent of the faculty whose salaries were increased because of prior service as administrators were male. An inflated pool can undermine the validity of a statistical study to determine imbalances.

84 F.3d at 677 (footnote deleted). The study relied upon by the university was deficient because it failed to properly compare the salaries of male and female professors using the criteria that the university utilized to award raises. See *Smith*, 84 F.3d at 676-77 (noting that VCU used performance, productivity, and merit to award prior raises and that these factors were not considered in the salary equity study).

The study used by VCU attempted to compare the salaries paid to male and female professors. As professors, whether male or female, the faculty at VCU was employed to teach and conduct research. The salary equity study, though deficient, compared the salaries paid to members of the same profession. Dr. Bradley's studies, however, evaluate the RP3 ranking process by using not a single job title for comparison, such as professor, but by using job groups. As he admitted during the evidentiary hearing, his study utilized results from a job

group, which could include diverse jobs such as counsel, optician, physician, and psychologist. The ratings for performance as a counsel may be different from those for a physician, even if the counsel and physician being compared are of the same race.

We are of opinion and hold that the district court did not abuse its discretion in excluding Dr. Bradley's testimony based on his statistical analysis. The analysis was based on comparisons that were not relevant to Miss Anderson's claims. "The usefulness of statistics depends on the surrounding facts and circumstances." *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) (citing *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)).

The district judge stated briefly and clearly the reasons for her decision, with which we agree:

> THE COURT: All right. The court grants the motion in limine. The court finds that the studies are deficient because they use the EEO job groupings. And the witness has conceded that the rating forms differ within the EEO job groupings, and he made no analysis of the difference in the rating schemes for jobs within the EEO job groupings, nor what the purpose of the EEO job groupings was from the point of view of its decision to group certain kinds of job categories together for that purpose.
>
> That purpose seems to have nothing to do with actual job performance or job requirements. And in order to evaluate whether or not there is disparate impact in ratings, similarly situated persons who are being rated must be compared. And there is simply too much disparity in the groups that have been used to control, and an absence of the use of a control factor that would control for the actual job title or the job duties.
>
> And it does appear to me — and I believe the witness has conceded that that could have been done and was not controlled for, and for that reason the court grants the motion.

## VI.

Miss Anderson also challenges the district court's decision to exclude a report prepared by the Department of Energy. We review a district court's decision to exclude such evidence for abuse of discretion. *United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988). As we noted above, a district court abuses its discretion if it makes an error of law in deciding whether to admit or exclude evidence. See *Hunter*, 281 F.3d at 150.

Anderson sought to introduce as evidence an assessment entitled "Department of Energy's Assessment of Westinghouse Savannah River Company's Equal Employment Opportunity Human Resources and Employee Concerns Programs." The Department of Energy assessed the Savannah River Site's equal employment opportunity and diversity programs in 2000 and submitted a draft of its assessment to Westinghouse. The assessment is not final, and it is stamped "DRAFT" on the first page. Furthermore, the contents page and the first page of Section IX (Employee Concerns Programs), which is uncompleted, state that Section IX is "to be completed later." As of March 2002, Westinghouse had not received a final version of the assessment.

The district court granted the defendants' motion to exclude the assessment on the grounds that it suffered from multiple levels of hearsay and was not within the exception under Federal Rule of Evidence 803(8). The district court also noted that the assessment was a draft, not a final report, and that the limited probative value of the draft was "far outweighed by the numerous trustworthiness concerns . . . coupled with the risk of unfair prejudice based on inclusion of allegations of events that may have nothing to do with a given Plaintiff or Defendant."

Rule 803(8) of the Federal Rules of Evidence excepts from the hearsay rule reports compiled by "public offices or agencies" in compliance with the office or agency's duty under law "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8). In *Distaff, Inc. v. Springfield Contracting Corp.*, 984 F.2d 108, 111 (4th Cir. 1993), we explained that an investigative report may be admissible under Rule 803(8) if its contents are

trustworthy. See also *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 241 (4th Cir. 1999) ("The admissibility of a public record specified in the rule is assumed as a matter of course, unless there are sufficient negative factors to indicate a lack of trustworthiness, in which case it should not be admitted."). Courts may look to several factors to determine if the report is admissible: "(1) the timeliness of an investigation; (2) the special skill or experience of the official; and (3) possible motivational problems." *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300-01 (4th Cir. 1984). The *Distaff* court noted several factors which may reveal a lack of trustworthiness, namely "unreliability, inadequate investigation, inadequate foundation for conclusions, (and) invasion of the jury's province." 984 F.2d at 111 (citing Weinstein, *Weinstein's Evidence*, § 803(8)).

A review of the factors listed above reveals that the district court did not abuse its discretion in excluding the assessment. The Department of Energy's investigation began in 2000 and was not completed by March of 2002. The draft assessment contains multiple levels of hearsay as well as referring to a complaint from an individual who is a plaintiff in a companion case to this lawsuit (one William Hall). The assessment does not have an adequate foundation for its conclusions. The assessment team from the Department of Energy sought to document employee perceptions about equal opportunity programs, but the team only interviewed employees who responded to an open invitation sent by email. Those who were interviewed constituted less than one percent of the workforce at the Savannah River Site. The assessment team admitted in its report that it "did not attempt to verify the perception of the employees" who were interviewed. In analyzing the racial composition of interview panels, the assessment team based its statistics on a review of 30 interview panels. During the 21-month period from which those 30 panels were chosen, the Savannah River Site utilized about 900 panels to select candidates for new positions. Of those 900 panels, the assessment team thus reviewed the racial composition of only 3.3% of the panels.

The admissibility of a report under Rule 803(8) is "permissive and not mandatory." *United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988). In *Gray*, we held that the district court did not abuse its discretion by refusing to admit under Rule 803(8) an internal IRS report which was a "tentative internal report." 852 F.2d at 139. Furthermore,

the risk of unfair prejudice from information contained in the IRS report far outweighed its probative value. Based on the fact that the Department of Energy's assessment was only a draft report and noting the concerns which we have mentioned, which are evidence of the assessment's lack of trustworthiness, we are of opinion and hold that the district court did not abuse its discretion in excluding the assessment.

VII.

A.

Following the district court's order denying class certification, Miss Anderson proceeded with her lawsuit individually. In her Fourth Amended Complaint, Miss Anderson claims that the RP3 ranking system and the CBPS have a disparate impact on black employees on the basis of race. On appeal, Miss Anderson challenges the district court's decision granting summary judgment to the defendants on her disparate impact claims.

We look first at Miss Anderson's claim that the RP3 ranking system has a disparate impact on black employees. To establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must "show that the facially neutral employment practice had a significantly discriminatory impact." *Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1990) (citing *Connecticut v. Teal*, 457 U.S. 440, 446 (1982)). If a plaintiff establishes a prima facie case, "the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination." *Teal*, 457 U.S. at 446-47 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, (1971)). "Even in such a case, however, the plaintiff may prevail, if he shows that the employer was using the practice as a mere pretext for discrimination." *Teal*, 457 U.S. at 447.

In establishing a prima facie violation of Title VII, a plaintiff may use statistical evidence. See *Walls*, 895 F.2d at 191 (citing *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979)). In this case, the district court excluded Dr. Bradley's testimony based on statistical evidence which we have affirmed. In her brief, Miss Anderson

acknowledges that she cannot prevail on her disparate impact claim involving the RP3 system without Dr. Bradley's testimony. Miss Anderson did not address her RP3 disparate impact claim in her brief except to note that she wishes to pursue the claim if the district court's evidentiary ruling on Dr. Bradley's testimony is reversed. We have affirmed the district court's evidentiary ruling, and our affirmance admittedly forecloses Miss Anderson's chance for success on her RP3 disparate impact claim.[3]

## B.

We next address Miss Anderson's disparate impact claim involving the CBPS. On appeal, she argues that the district court erred by concluding that she had not established causation and by requiring her to prove intentional discrimination instead of a disparate impact claim. We review de novo her challenge to the district court's order granting summary judgment. *Williams*, 370 F.3d at 428.

Miss Anderson contends that two aspects of the CBPS have a disparate impact on black employees. First, she challenges the stage in the CBPS where applicants are selected for an interview, and, second, she challenges the stage where the interview panel chooses the candidate for the position after an interview. These steps are listed as #9, #12, and #13 in the description of the CBPS found on pages 8-9 of this opinion. Miss Anderson objects to the alleged subjectivity inherent in these steps in the CBPS.

By her identification of these steps in the CBPS, we assume, arguendo, that Miss Anderson has complied with the Court's instruction that a plaintiff in a disparate impact case must identify the specific employment practice that is being challenged. See *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988) (plurality opinion). Next, Miss Anderson must prove causation. 487 U.S. at 994. She must show that the above-mentioned practices caused a disparate impact on black employees at the Site.

---

[3]Miss Anderson withdrew her RP3 disparate impact claim after the district court excluded Dr. Bradley's testimony based on his statistical evidence. As a result, although she pursued this claim on appeal, her success is dependent on our decision on the evidentiary issue.

To establish causation, Miss Anderson relies on statistical evidence provided by Dr. Bradley about the CBPS. She argues that Dr. Bradley's statistical evidence ruled out the possibility that chance caused a disparate impact on black employees. Dr. Bradley had analyzed the percentage of black employees who were successful under the CBPS at three stages: (1) selection as qualified for a position from all candidates who apply; (2) selected for an interview from all qualified candidates; and (3) selected for the position from all interviewed candidates. Dr. Bradley compared the percentage of black employees who actually succeeded at each level with the percentage which he expected to succeed, based on the percentage of black employees at the Site. He found that the percentage of black applicants who actually succeeded at each step was much lower than he expected. From that evidence, which does not account for any other variables, Miss Anderson argues that causation is proven.

We do not agree. This evidence does not show that the reason black applicants failed to proceed at the interview selection stage and position selection stage was their race. Factors such as presentation in the interview, answers to interview questions, demeanor, and ability demonstrated in the interview of course entered into the judgment of the members of the panel as to the candidate who received a position that was being filled. And, at the interview selection stage, for example, education and experience are two factors that Dr. Bradley's analysis fails to quantify.

Furthermore, at each of the two stages which Miss Anderson challenges in the CBPS, the discretion of the person or panel making the decision is not unfettered. At each step, the decision maker must look to the core competencies listed in the CBPS manual and the specific functional competencies, which are chosen specifically for each position. At the interview stage, a panel of three interviewers must evaluate the candidate and must address each core and functional competency. The cases on which Miss Anderson relies to support her claim that causation has been proven involves supervisors who possessed unfettered discretion to make employment decisions. See *Watson*, 487 U.S. at 990 (noting that Title VII should apply to "an employer's undisciplined system of subjective decisionmaking"); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 287 (2d Cir. 1999) (noting that challenged promotion policy directed managers "to

hire the most qualified candidate, but no other instructions are given" and that managers have unfettered discretion over hiring for certain positions); *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1042 n.6 (7th Cir. 1991) (explaining that promotion to the position of leadman, which was a prerequisite to a promotion to management, "was left entirely to management's discretion, since it fell outside the seniority bidding system applicable to most hourly employment positions"); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (noting that "Wells Fargo admits that the process of job elimination and restaffing was otherwise discretionary and subjective"). The decision makers at the Site were required to comply with the CBPS, which, through the use of core and functional competencies against which all applicants must be evaluated, limits the discretion available to decisionmakers. Accordingly, the cases on which Miss Anderson relies are hardly supportive of her position, for the only relevant complaint she makes to the process is that the decision makers were white.

The district court did not bar from evidence Dr. Bradley's conclusion that there might be evidence of disparate impact in two hiring stages — the interview stage and the selection stage — and correctly rejected the claim that his conclusion that the preparation of the list of eligibles by the Human Resources department might be subject to a Title VII racial objection.

We assume for argument, without deciding, that Miss Anderson has shown a prima facie case because the district court did not bar Dr. Bradley's conclusions as to disparate impact with respect to the interview stage and the selection stage. So the question is whether the proffered circumstantial evidence of discriminatory impact is sufficient to satisfy the *McDonnell Douglas* framework of proof. *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001). See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination. Then the defendant must respond with evidence that it acted with a legitimate, nondiscriminatory reason. *Murrell*, 262 F.3d at 257. If the defendant makes this showing, then the plaintiff must "present evidence to prove that the defendant's articulated reason was pretext for unlawful discrimination." *Murrell*, 262 F.3d at 257. "Although the evidentiary burdens shift back and forth under the *McDon-*

*nell Douglas* framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff.'" *Murrell*, 262 F.3d at 257 (internal citation omitted).

As the district court correctly stated regarding the 1997 failure to promote disparate treatment claim, Miss Anderson "does not suggest that the comments recorded on her interview form are false or misleading representations of her actual interview responses." Slip op. at 5. Further, Miss Anderson failed to address her qualifications in terms of the disclosed weighted competency factors. Miss Anderson instead focuses on her claimed higher satisfaction of the minimum qualifications, such as her education level, an MBA as opposed to others with high school education, her performance of more years of administrative secretarial duties, and her numerous awards and recognition, which exceeded recognition received by other interviewees. The district court found in its opinion that "[w]hile these may be the criteria by which Anderson believes she should have been judged, Anderson has not offered any evidence that WSRC or the particular individuals who made up the CBPS panel have, at any time, applied such a set of standards." Slip op. at 6. For these reasons, pretext is simply not shown as there is no evidence to support it regarding the 1997 claim.

Miss Anderson similarly fails to point to any evidence that would support the conclusion that she deserved a higher rating on any of the areas evaluated for the 1998 promotion to administrative assistant. She also fails to provide any evidence that the panel overlooked evidence of her abilities in the areas contained in her application. Rather, as with the 1997 application, she focuses on her supposed greater qualifications in terms of total years of employment or education. Again, Miss Anderson has not proffered evidence to suggest that the legitimate reason offered by WSRC for its hiring decision is pretextual.

So pretext has not been shown for either the 1997 or 1998 claim and the decision of the district court is affirmed.

## VIII.

We turn next to Miss Anderson's individual disparate treatment claims. Her first claim relates to her December 1997 application for

the position of administrative assistant in the Environmental Restoration Division, Project Administration Department. Miss Anderson claims that the defendants failed to promote her on the basis of her race. Linda Clarke, a white employee, received the promotion instead of Miss Anderson. Her claim is a disparate treatment claim.

To prevail on a disparate treatment claim for failure to promote, Miss Anderson must establish that she was treated less favorably because of her race. See *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Carter v. Ball*, 33 F.3d 450, 456 n.7 (4th Cir. 1994). In order to establish a prima facie case of racial discrimination in promotions under § 1981 or Title VII, Miss Anderson must follow the burden-shifting framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *Bryant v. Aiken Reg. Med. Ctrs. Inc.*, 333 F.3d 536, 544-45 (4th Cir. 2003).[4] Under the *McDonnell Douglas* framework, Miss Anderson can establish a prima facie case by showing that (1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination. See *Bryant*, 333 F.3d at 544-45; *Carter*, 33 F.3d at 458. If a prima facie case is established, the burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for the decision not to promote. *McDonnell Douglas*, 411 U.S. at 802; see *Bryant*, 333 F.3d at 545. After the employer states a reason for its decision, Miss Anderson has the opportunity to show that the stated reason is a pretext for discrimination, see *McDonnell Douglas*, 411 U.S. at 804, and the trier of fact must determine if the plaintiff has proved that the employer intentionally discriminated against her because of her race. *Bryant*, 333 F.3d at 545 (citing *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir. 1995)).

Miss Anderson applied for the position of administrative assistant in the Environmental Restoration Division, Project Administration

---

[4]The *Bryant* court noted that "[i]n failure-to-promote cases such as this, 'the framework of proof for disparate treatment claims . . . is the same for actions brought under Title VII, or § 1981, or both statutes.'" *Bryant*, 333 F.3d at 545 n.3 (quoting *Mallory v. Booth Refrig. Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989)).

Department in November of 1997. She interviewed for the position on December 15, 1997. The interview panel rated Miss Anderson on the six core competencies (teamwork, leadership, communications, employee development, business results, and self management) and four functional competencies (customer focus, flexibility, problem solving, and professionalism). Based on her interview responses, the panel gave Miss Anderson a total consensus rating of 136. The employee who was promoted, Linda Clarke, a white woman, received a total consensus rating of 190.

Miss Anderson's primary contentions on appeal are that she had more education and more experience at the Savannah River Site than Mrs. Clarke and that Miss Anderson's consensus rating was low based on her work evaluations and numerous awards and commendations. The interview panel chose Linda Clarke to receive the promotion because she was the "[b]est candidate based on quals. and interview." Anderson must show that this reason was a pretext for racial discrimination. See *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), the Supreme Court explained that a plaintiff may establish pretext by proving that the defendant's explanation for an employment decision is "unworthy of credence" or that the defendant's explanation is false. The *Reeves* Court also noted that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." 530 U.S. at 147. We followed *Reeves* in *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 648-49 & n.4 (4th Cir. 2002), and determined that a plaintiff in a failure to promote case is not necessarily required to meet the test in *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996), that a plaintiff "must establish that she was the better qualified candidate for the position sought." *Evans*, 80 F.3d at 960 (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.32d 1281, 1287 (4th Cir. 1985); *Young v. Lehman*, 748 F.2d 194, (4th Cir. 1984)).

*Dennis* instructs that we should not rigidly apply the *Evans* standard for comparing the plaintiff's qualifications with those of the person who received the promotion, but we may also consider the veracity of the reasons, annunciated by the employer, why the plain-

tiff did not receive the promotion. *Dennis*, 290 F.3d at 648-649 & n.4. "*Reeves* plainly instructs us to apply a contrary approach [to *Evans*] by affirming that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Dennis*, 290 F.3d at 648 n.4 (citing *Reeves*, 530 U.S. at 147).

Miss Anderson cannot establish her own criteria for judging her qualifications for the promotion. She must compete for the promotion based on the qualifications established by her employer. See *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (1997) ("[A]bsent evidence of retaliatory motive, we leave to the employer's discretion the method of evaluating an employee's job performance."); see also *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment.").

We assume, arguendo, that Miss Anderson has stated a prima facie case of racial discrimination. The question on her first claim for failure to promote thus turns on the issue of pretext. In order to prevail, Miss Anderson must direct us to evidence which indicates that the defendants' stated reasons for promoting Mrs. Clarke over Miss Anderson were a pretext for discrimination.

Miss Anderson had an executive secretary diploma and a bachelor of science degree in human resource management at the time she applied for the position of administrative assistant in the Environmental Restoration Division, Project Administration Department. She was close to finishing her masters in business administration. The minimum educational requirements for the position were a high school diploma and eight to twelve years of practical experience in a business or administrative area, or an associate degree in a nontechnical or business discipline with at least four to seven years of practical experience in a business or administrative area, or a bachelor's degree in a nontechnical or business discipline and at least one to three years of practical experience in business, administrative, budgeting, or program planning. Miss Anderson exceeded the educational requirements, and she had more education than Linda Clarke, who only had a high school diploma. However, educational qualifications, while listed in the minimum requirements section of the administrative

assistant competency based posting system job description, were not among the factors that the interview panel used to determine each applicant's consensus rating. As a result of the defendants' decision to base the promotion decision on the core and functional competencies listed in the job description and not on the educational levels of applicants, Miss Anderson cannot rely on her educational background to establish that the defendants' reasons for promoting Mrs. Clarke was a pretext for discrimination. See *Beall*, 130 F.3d at 620; *Jiminez*, 57 F.3d at 383. Miss Anderson may not choose the areas in which she wants to compete with Mrs. Clarke for the promotion; those areas are for the employer's choosing.

Miss Anderson contends that she has more experience at the Savannah River Site than Mrs. Clarke. At the time of her application for promotion to administrative assistant in the Environmental Restoration Division, Project Administration Department, Mrs. Clarke had 15 years of secretarial experience prior to beginning work at the Savannah River Site. After being hired at the Site, she had seven years of experience at the time she applied for the position. In contrast, Miss Anderson had only eight years of experience as a secretary at the Site. While Miss Anderson, with seven years of secretarial experience and twelve as a typist or stenographer, has a longer total tenure at the Site than Mrs. Clarke, she cannot choose the criteria by which an employer makes a promotion decision. See *Beall*, 130 F.3d at 619-20. Regarding experience, the CBPS posting of the position explained that experience was a minimum requirement, and not a deciding factor in the application process.

Furthermore, the deciding factor in the promotion decision was the rating for core and functional competencies that each applicant who was interviewed received. Mrs. Clarke received the highest score, 190, and Miss Anderson received the second-lowest score, 136. A comparison of the two rating forms, compiled by the same interview panel, indicates that the panel found Mrs. Clarke to be the superior candidate. Miss Anderson's attempts to show that the CBPS system, which creates the consensus rating system upon which the promotion decision was based, discriminates against black employees also are unsuccessful. This contention is based on Dr. Bradley's study comparing the percentage of black employees who are successful at three separate steps in the CBPS to the expected percentage of successful

black candidates based on the total percentage of black employees at the Site. As we discussed previously, this study fails to consider the various factors that are involved in a promotion decision. It does not prove that the CBPS discriminates against black employees on the basis of race, and Miss Anderson cannot use it to avoid summary judgment on her 1997 failure to promote claim. We are of opinion that the district court did not err in granting summary judgment to the defendants on this claim.

Miss Anderson's next claim involves her application in 1998 for a promotion to administrative assistant in the Business Development and Community Outreach Division. Miss Anderson was not selected for an interview, and a white woman, Mrs. Brenda Pearson, was selected to receive the promotion. Miss Anderson contends that she did not receive the promotion due to her race.

The issue again turns on pretext as we assume, arguendo, that Miss Anderson has established a prima facie case of racial discrimination. On appeal, Miss Anderson contends that she established pretext because she has a stronger educational background than Mrs. Pearson, that the defendants pre-selected Mrs. Pearson for the position, and that the ratings given to Miss Anderson in the interview selection stage evidence discrimination because they do not correspond to Miss Anderson's performance reviews. Miss Anderson also reiterates the contention, which we have rejected, that the CBPS discriminates against black employees seeking promotions at the Site.

While Miss Anderson has a stronger educational background than Mrs. Pearson, education is listed as a minimum requirement for the position and is not a deciding factor in determining who receives the promotion. Mrs. Pearson received the promotion because she had a higher consensus rating on the core and functional competencies for the position than Miss Judy Burch, the other employee interviewed for the promotion. The selection of applicants for interviews also was based on an evaluation of core and functional competencies, not on educational backgrounds. As we noted before, Miss Anderson may not choose the criteria on which she wishes to compete with Mrs. Pearson for the promotion. Moreover, she cannot establish pretext by relying on criteria of her choosing when the employer based its deci-

sion on other grounds. See *Beall*, 130 F.3d at 620; *Jiminez*, 57 F.3d at 383.

Miss Anderson next contends that she established pretext by showing that Miss Virginia Wolfe, the hiring manager for the 1998 promotion in the Business Development and Community Outreach Division, preselected Mrs. Pearson for the promotion. At the time the promotion decision was made, Mrs. Pearson was a secretary who reported to Miss Wolfe, along with eight other individuals. The functions of the position for which Miss Anderson applied were, prior to the selection of Mrs. Pearson, being performed by Mrs. Pearson in her position as a secretary reporting to Miss Wolfe.

The argument that a supervisor may have preselected an employee for a promotion "is not sufficient evidence for jurors reasonably to conclude" that the defendants' explanation for hiring Mrs. Pearson was prextext. *Mackey v. Shalala*, 360 F.3d 463, 468-69 (4th Cir. 2004). "If one employee was unfairly preselected for the position, the preselection would work to the detriment of all applicants for the job, black and white alike." *Blue v. United States Dep't of the Army*, 914 F.2d 525, 541 (4th Cir. 1990). The *Blue* court noted that while preselection may establish that an employee was "unfairly treated, it does not by itself prove racial discrimination." 914 F.2d at 541 (citing *Casillas v. United States Navy*, 735 F.2d 338, 344 (9th Cir. 1984) ("Title VII does not ensure the best will be selected—only that the selection process will be free from impermissible discrimination."))

Miss Anderson's final contention regarding the 1998 promotion is that the ratings given to her in the interview selection stage establish pretext because they do not reflect the positive evaluation she received during her performance reviews. Miss Anderson's argument asks us to review the process by which the defendants select employees for promotion. Miss Anderson has not introduced any evidence that her performance reviews were submitted to the hiring manager who selected applicants for an interview. Without proof that the hiring manager had access to Miss Anderson's performance reviews, there is no basis to conclude that the hiring manager was even aware of the positive comments Miss Anderson had received on her performance evaluations. Furthermore, the performance evaluation is a review of an employee's performance in her current position, while

the process of selecting a person for a promotion involves a consideration of how that employee will perform in a different position. In other words, the performance evaluation and the interview selection stage, which involves an analysis of how the applicant meets the core and functional competencies of the position that is open, are not interchangeable. We do not sit as a "super-personnel department weighing the prudence of employment decisions" made by the defendants. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). We cannot require that different supervisors within the same organization must reach the same conclusion on an employee's qualifications and abilities.

We are of opinion that the district court did not err in granting summary judgment to the defendants on Miss Anderson's 1998 failure to promote claim.

Miss Anderson's final disparate treatment failure to promote claim centers on her failure to receive a promotion in place from SGL 28 SOP to SGL 30 SOP. At the time she sought this promotion, she was an administrative assistant in the university relations group within the chemicals hydrogen technology group. Again, the issue turns on the question of pretext.

Miss Anderson must establish that there is a genuine issue of material fact as to the defendants' stated reason for why she did not receive a promotion in place to SGL 30 SOP. The defendants have introduced affidavits from three compensation analysts who recommended that Miss Anderson's position remain a SGL 28 SOP position instead of a SGL 30 SOP position as of 1999. Miss Anderson does not direct us to any evidence which suggests that these analysts reached their conclusions by improperly considering race instead of the actual responsibilities of Miss Anderson's position. Miss Anderson attempts to rely on her own affidavit to create a genuine issue of material fact, but nothing in her affidavit controverts the analysts' analysis of her position or suggests that the analysts were motivated by racism to refuse to qualify her position as a SGL 30 SOP position.

Miss Anderson attempts to establish pretext by comparing herself with two white employees who received promotions in place within two years of entering their current position. This argument fails to

establish pretext. Miss Anderson seeks to compare herself to employees who hold positions that are dissimilar to her own. The first white employee, Craig Stripling, is an associate engineer who was promoted from SGL 28 to SGL 30 after working as an associate technical support specialist for less than two years. The second, Michelle Trill, a human resources consultant, was promoted six times between 1989 and 1995. These two white employees worked in separate divisions from Miss Anderson and had different responsibilities. Their promotions could be based on factors that may not be present in Miss Anderson's position. The fact that the white employees received promotions and Miss Anderson did not, when the job requirements and responsibilities for the white employees are different from Miss Anderson's, does not establish pretext.

Miss Anderson further claims that the rapid promotions of these two white employees occurred in violation of a Site policy that employees do not receive pay increases unless they have been in their current position for more than two years. Miss Anderson bases this claim on a statement made to her by her manager that "promotions were not usually given until an employee had been in a position for two to four years." This statement, which contains the qualifier "usually," coupled with the fact that Miss Trill and Stripling were promoted without two years of experience in their positions, does not establish pretext. Miss Anderson's manager informed her of the usual policy, but his statement reflects the fact that exceptions do exist.

Miss Anderson did not receive a promotion in place because her job responsibilities did not warrant such an increase. She has not shown us any evidence which suggests that this reason was a pretext or from which a jury could infer pretext. See *Bryant*, 333 F.3d at 544 (noting that a jury could infer discrimination based on "the lack of any real reason to deny Bryant the job"). In this case, the defendant has stated a reason why Miss Anderson did not receive a promotion, and Miss Anderson has been unable to controvert it.

We are of opinion that the district court did not err in granting summary judgment to the defendants on Miss Anderson's disparate treatment failure to promote in place claim.

IX.

Miss Anderson appeals the district court's decision denying the plaintiffs' motion for class certification. On appeal, she argues that the district court erred by failing to certify two subclasses, one composed of black Site employees who were discriminated against under the CBPS and one composed of black Site employees who were discriminated against under the RP3 system. Miss Anderson is not a member of either of the two subclasses. As we have discussed above, all of Miss Anderson's claims, whether based on a disparate impact or disparate treatment theory, are without merit, and the district court properly granted summary judgment to the defendants on each of the claims. Miss Anderson voluntarily has dismissed the one claim which remained after the district court ruled on the defendants' motion for summary judgment, the disparate treatment merit pay claim. Accordingly, Miss Anderson no longer has any valid claims pending in this case.In *Cox v. Babcock & Wilcox Co.*, 471 F.2d 13 (4th Cir. 1972), and later in *Goodman v. Schlesinger*, 584 F.2d 1325 (4th Cir. 1978), we considered almost the same issue.

In *Cox*, the plaintiff alleged that he was subject to unlawful discrimination under the employment practices of the defendant. 471 F.2d at 14. The plaintiff brought both individual and class action claims. The district court proceeded to try the plaintiff's individual claims in a bench trial with an advisory jury without first ruling on the plaintiff's class action claims. After the bench trial, the district court dismissed the plaintiff's individual claims after concluding that the defendant had not practiced illegal discrimination. 471 F.2d at 14. The district court then dismissed the plaintiff's class action claims because the plaintiff, without any individual claims, was not a proper class representative. The plaintiff appealed both rulings to this court.

On appeal, we affirmed the district court's dismissal of the plaintiff's individual claims. 471 F.2d at 14-15. Turning next to the plaintiff's class claims, we noted the awkwardness of remanding the class claims to the district court where the plaintiff, although "finally adjudged not to be a member of the class he seeks to represent," would nonetheless continue to prosecute the class claims in the district court upon remand. 471 F.2d at 15-16. We remanded the class claims to the district court and instructed the district court to hold the

docket for the class claims open in case any other plaintiffs presented proper claims against the defendant. 471 F.2d at 16.

In *Goodman*, the district court denied the plaintiffs' motion for class certification on the grounds that the plaintiffs did not comply with the requirements of Rule 23 of the Federal Rules of Civil Procedure. 584 F.2d at 1327. At trial on the plaintiffs' individual claims, the district court found against the plaintiffs and denied their individual claims. 584 F.2d at 1329-1331. On appeal, the plaintiffs challenged the district court's rulings on both the denial of class certification and the dismissal of the individual claims.

We affirmed the dismissal of the plaintiffs' individual claims and noted that the plaintiffs "have had their day in court" to pursue their individual claims. 584 F.2d at 1331. Turning to the certification issue, the court determined that the district court acted prematurely in declining to certify the class action because the district court ruled on the certification question prior to the completion of discovery. 584 F.2d at 1332. Following *Cox*, in *Goodman* we remanded the class action issue to the district court but instructed that the plaintiffs in the appeal might not pursue the class claims on remand. Instead, the district court should retain the case on the docket for a reasonable time to "permit a proper plaintiff or plaintiffs, with grievances similar to [the plaintiffs on appeal], in person, to present himself to prosecute the action as class representative. *Goodman*, 584 F.2d at 1332-1333. We followed the procedure in *Goodman* and *Cox* again in *Simmons v. Brown*, 611 F.2d 65 (4th Cir. 1979).

On appeal, Miss Anderson seeks to be a class representative for two separate sub-classes based on the defendants' use of the CBPS and RP3 systems. Her claims have not been mooted, but instead have been adjudged to be without merit. Miss Anderson has no valid claims which give her "the same interest" and cause her to "suffer the same injury" as the proposed class members she seeks to represent. See *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

The claim of Miss Anderson on appeal with respect to the denial of certification of a class action is clearly stated:

Anderson appeals the District Court's denial of certification of two subclasses of African-American employees with claims based on (1) the CBPS and (2) the RP3.

With respect to the RP3 claim, there is no indication or claim of any successful prosecution of that claim without the rejected testimony of Dr. Bradley, who was examined in open court by the district judge and the parties. The denial of the district court to certify a class action with respect to the RP3 procedure is accordingly affirmed.

With respect to the CBPS claim, we express no opinion on the question of whether or not some part of Miss Anderson's claim relating to the administration of that system of career advancement or job availability may be a colorable class claim, although none has been shown here. We say this because of the decision of the district court with respect to Dr. Bradley's testimony in which it denied the motion to exclude the testimony "from the qualified to the interview stage, and from the interview stage to the selection stage," but it granted the motion to exclude the testimony "from the pool stage to the qualified stage." Stated simply, the court held that the evidence did not show that the Human Resources Department might have discriminated in preparing the list of those qualified for job openings but that the statistical evidence might be admissible if it tended to show the possibility of discrimination in selecting those applicants who would be interviewed and in selecting the person for the job from among those interviewed.

While we express no opinion on whether or not the class action may fail for want of commonality or typicality, we remand to the district court the question of whether or not a class action should be permitted to proceed with respect to the "qualified to the interview stage, and from the interview stage to the selection stage." Upon remand, if a proper plaintiff or plaintiffs with grievances similar to those of Miss Anderson with respect to that discrete portion of the CBPS procedure presents himself to prosecute, himself, as a class representative, the district court should then decide whether a class action is maintainable and whether the then named plaintiff should represent the class. We express no opinion as to the weight, if any, to give Dr. Bradley's testimony or whether it is admissible. If no representative plaintiff so comes forward within a reasonable time, then the district court should

strike the class action from the calendar and enter a final dismissal thereof. *Goodman*, 584 F.2d at 1332-33.

## X.

Accordingly, as stated above, the district court's decision excluding Dr. Bradley's expert RP3 testimony, excluding the Department of Energy draft assessment, and granting summary judgment to the defendants on Miss Anderson's individual disparate impact and disparate treatment claims are affirmed. The denial of a class action with respect to the RP3 procedure is affirmed, as is the denial of a class action with respect to the CBPS procedure, with the exception of that part of the CBPS procedure noted just above. This action is remanded to the district court to keep the same on the docket for a reasonable time, with instructions to determine if there is another plaintiff who wishes to maintain a class action under the principles established in *Cox* and *Goodman* we have referred to.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS.*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I am pleased to concur in Judge Widener's thorough and well reasoned opinion insofar as it affirms the district court's judgment. But I cannot agree with a remand "to determine if there is another plaintiff who wishes to maintain a class action."

Because the plaintiff has no cognizable claim, she is not in a position to represent a class of others because either her claims are not typical of the others or, if they are, the others' claims likewise have no merit.

The problem that Judge Widener raises in Part IX would, in my judgment, be resolved just as well by some other plaintiff, not in this case, alleging his or her own claim and seeking to prosecute it as a class action. As for this case, I would consider it ended with our opinion affirming the judgment of the district court.

By remanding this case to the district court with no plaintiff, we can only be inviting new claims — different from those that we have rejected in this case — to be filed on behalf of a new plaintiff and unspecified others. This is not the situation where a plaintiff's claims have been dismissed on a technical deficiency, and we would be allowing another plaintiff without that deficiency to continue the case. Rather, we have a case where the plaintiff's claims were dismissed because the claims themselves were deficient. In short, there is nothing to perpetuate on remand.

Accordingly, I respectfully dissent from Part IX and the remand remedy contained in Part X. Otherwise, I concur in this fine opinion.

GREGORY, Circuit Judge, dissenting in part:

Although I agree with most of the majority's analysis, I write separately because I cannot concur in the disparate impact analysis contained in part VII(B). There, the majority affirms a grant of summary judgment against Ms. Anderson on her disparate impact claim despite the fact that she produced evidence showing a statistically significant variation between the number of African-Americans who apply and the number who are successful at both the second and third stages of the CBPS. The majority first finds that because Ms. Anderson's evidence challenging the subjective nature of the second and third stages of the CBPS failed to control for all subjective variables potentially taken into account in the interview and hiring decisions, she failed to establish the causation element of her prima facie burden. Second, the majority finds that even if Ms. Anderson had in fact satisfied her prima facie burden, her claims would fail because she cannot make the requisite *McDonnell Douglas* showing that Westinghouse's legitimate non-discriminatory rationale was mere pretext for a racially discriminatory decision.

Because I cannot agree with either of these contentions, I respectfully dissent from that particular part of the majority opinion.

I.

Under Title VII of the Civil Rights Act of 1991:

It shall be an unlawful employment practice for an employer —

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2 (2005). From inception, it was clear that the act covered cases of disparate treatment — where one party was intentionally discriminated against by an employer on the basis of race, color, religion, sex, or national origin. *See Int. Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)("Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.").

However, in the seminal case of *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), the Court held that "[t]he Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *See Peters v. Jenney*, 327 F.3d 307, 321 n.17 (4th Cir. 2003) ("Title VII prohibits practices that are not intentionally discriminatory but that have a disparate impact on members of a particular racial group."). As amended in 1991, Title VII now explicitly recognizes disparate impact claims. 42 U.S.C. § 2000e-2(k). Section 2000e-2(k) states as follows:

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate

impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

42 U.S.C. § 2000e-2(k).

Similar to its analysis of disparate treatment, the Supreme Court has laid out a burden shifting scheme for disparate impact actions. *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994-95 (1988). Under the disparate impact burden-shifting scheme, the first step is for the plaintiff to establish a prima facie case of disparate impact. *See id.* at 994. To make this prima facie showing, a plaintiff must (1) identify a specific policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two. *See id.* at 994-95. Upon successfully presenting a prima facie case, the burden then shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(a)(i); *see Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1990)("[T]he employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination."). Finally, even if the employer makes a sufficient showing that the challenged practice is "job related," the plaintiff may prevail by showing the existence of an equally effective alternative practice that eliminates the disparate impact and the employer refuses to adopt this alternative. 42 U.S.C. § 2000e-2(k)(1)(a)(2); *see Allen v. City of Chicago*, 351 F.3d 306, 311-12 (7th Cir. 2003)("If the defendant makes this showing, plaintiffs can still prevail by demonstrating that an alternative employment practice exists, and the defendant refuses to adopt it.").

## II.

Contrary to the majority, I believe that Ms. Anderson did in fact satisfy her prima facie burden for a Title VII disparate impact claim. Therefore, I will address each step of the analysis in turn.

## A.

As noted earlier, the first step in establishing a prima facie case is the identification of a specific policy or practice. Here, Ms. Anderson challenges the second and third stages of the Competency Based Posting System ("CBPS")[1] as having a disparate impact on African-American employees. Ms. Anderson specifically challenges the subjective decision-making involved in each stage. The majority "assumes arguendo" that by challenging these stages Ms. Anderson identified a specific employment practice.

In *Watson*, the Court addressed the issue of whether a disparate impact analysis could properly be applied to subjective criteria.[2] *See Watson*, 487 U.S. at 989. There, the Court held that "subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases." *Id.* at 991. "We are persuaded that our decisions in *Griggs* and succeeding cases could largely be nullified if disparate impact analysis were applied only to standardized selection practices." *Watson*, 487 U.S. at 989. The Court continued on to conclude that:

> If an employer's undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. In both circumstances, the employer's practices may be said to "adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2).

---

[1]Specifically, Ms. Anderson challenged steps #9, #12, #13 of the CBPS.

[2]In *Watson*, the Court noted that its disparate impact jurisprudence had always involved cases in which standardized employment tests or criteria were challenged. *Id.* at 988. For example, in *Griggs* the Court faced challenges to high school diploma requirements and aptitude tests. *Griggs*, 401 U.S. 301-02. Similarly, in *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 427 (1975), the Court faced challenges to aptitude tests. Finally, in *Connecticut v. Teal*, 457 U.S. 440, 445 (1982), the Court faced challenges to written examinations.

*Id.* at 990-991.

In this case, I would find that Ms. Anderson did in fact satisfy the first element of her prima facie burden. Ms. Anderson challenged the second and third stages of the CBPS system, both of which entail an interview panel subjectively rating qualified candidates across a number of subjective criteria. The second stage is a screening stage, where the applications of applicants who are found to meet the minimum requirements by the Human Resources department are forwarded to the manager of the department with the opening. That person, either by themself or in conjunction with two others, then screens all the applications with "core competencies" (teamwork, leadership, communications, employee development, business results and self management) and "functional competencies" in mind, to find the most qualified candidates to interview for the position. The third stage of the process involves the actual interviews of those candidates selected. Interviews are conducted by a three-person panel, during which each member of the panel evaluates the candidate in writing according to the above criteria and any other relevant characteristics. After all interviews are conducted, the panel then selects who it believes is the best person for the position.

Ms. Anderson is not required to challenge a more specific aspect of the hiring process, particularly when she is challenging a subjective process. In *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420, 1424-25 (9th Cir. 1990), the Ninth Circuit held that where "[e]mployment decisions as to which jobs would be eliminated and as to who would fill the remaining positions was essentially left to the discretion of the various bank departments," such a policy was a specific employment practice subject to disparate impact analysis, even where the managers were instructed to consider factors such as longevity and performance. Similarly, in this case, while those making the decisions in the second and third stages of the CBPS were instructed to evaluate candidates according to certain qualities, whether the applicants showed any aptitude for the guideline qualities was an entirely subjective evaluation. After all, how does one truly quantify or measure "teamwork" or "communications" without making a wholly subjective assessment?

In its attempt to distinguish cases such as *Watson* and *Rose*, I believe that the majority overstates the level to which the discretion

present in this case was cabined by the process. Focusing on the *Watson* Court's language describing subjective employment practices as "unchecked discretion" and as an "undisciplined system of subjective decision making," the majority argues that because the discretion in this case was not unfettered, the holdings of *Watson* and *Rose* are not applicable here. The majority finds support for this position in the fact that the decision makers were instructed to consider core and functional competencies when making their decisions. However, the majority's focus on the *Watson* Court's language describing subjective employment practices as "unchecked discretion" and as an "undisciplined system of subjective decision making," is misplaced. The crux of the *Watson* decision is that "disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests" because "[i]n either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices." *Watson*, 487 U.S. at 990. Later in the *Watson* opinion, the Court then repeated this position, stating "[i]f an employer's undisciplined system of subjective decision making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply." *Id.* at 990-91. The clear focus of the *Watson* opinion is not the degree to which subjective discretion is unfettered, but instead the fact that both objective and subjective criteria can have deleterious effects that are indistinguishable from intentionally discriminatory practices. *That* was the reason the Court concluded "that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases." *Id.* at 991.

Because I believe that the challenged practices are undisputably subjective in nature, I see no reason not to apply the rule of *Watson* in this case, and find that Ms. Anderson identified a specific employment practice.

### B.

Ms. Anderson was next required to show a causal nexus between the challenged practice and the disparity. The statute itself mandates that the plaintiff demonstrate that the employer "uses a particular

employment practice that *causes* a disparate impact." 42 U.S.C. § 2000e-2(k); *see Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989)("a Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.").

As an initial matter, it is well recognized that statistical evidence may be employed in disparate impact cases to show the existence of a disparity. *See New York City Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979); *Walls*, 895 F.2d at 191 ("A plaintiff may use statistical evidence to establish a prima facie violation of Title VII."). As the Court noted in *Watson*, the term "disparity" has "never been framed in terms of any mathematical formula." *Watson*, 487 U.S. at 994-95. Further, the Court has never "suggested that any particular number of standard deviations can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination," but has instead endorsing a case-by-case approach. *Id.* at 995 n.3.

Ms. Anderson presented the testimony of Dr. Edwin Bradley, Ph.D., CEO of Quantitative Research Associates. Specifically, Dr. Bradley found that at the second screening stage, a statistically significant under-representation (-6.64 standard deviations) of African-Americans existed when the pool of applicants meeting the minimum qualifications for the posted position was compared to the applicants actually selected for an interview. J.A. 1645. Similarly, Dr. Bradley found that at the third screening stage, a statistically significant under-representation (-2.38 standard deviations) of African-Americans existed when the pool of applicants selected for an interview was compared to those selected for appointment. J.A. 1645.

Despite this, the district court concluded and the majority concludes that because Ms. Anderson's statistical evidence failed to control for all variables that may have impacted the decisions made at the challenged stages, it is insufficient to establish causation. Specifically, the majority states:

> "This evidence does not show that the reason black applicants failed to proceed at the interview selection stage and

position selection stage was their race. Factors such as pre-
sentation in the interview, answers to interview questions,
demeanor, and ability demonstrated in the interview of
course entered into the judgment of the members of the
panel as to the candidate who received a position that was
being filled."

*Ante* at 25.

However, statistical evidence does not have to control for every
single variable in order to be sufficient. As the Supreme Court stated
in *Bazemore v. Friday*, 478 U.S. 385 (1986), "it is clear that a regres-
sion analysis that included less than all 'measurable variables' may
serve to prove a plaintiff's case. A plaintiff in a Title VII suit need
not prove discrimination with scientific certainty; rather his burden is
to prove discrimination by a preponderance of the evidence."[3] *Id.* at
400. Therefore, requiring Ms. Anderson to account for every possible
variable that may have impacted the outcome goes beyond Supreme
Court formulations of the plaintiff's burden in a Title VII disparate
impact case. In *Watson*, a case where the Court faced a challenge to
subjective practices, the Court required that the plaintiff "offer evi-
dence of a kind and degree sufficient to show that the practice in
question has caused the exclusion of applicants for jobs or promotions
because of their membership in a protected group," and importantly
noted that its formulations have "consistently stressed that statistical
disparities must be sufficiently substantial that they raise such an
inference of causation." *Watson*, 487 U.S. at 995. Similarly, in *Albe-
marle*, the Court required the plaintiff to show "that the tests in ques-

---

[3]The Court's decision in *Bazemore* has been read as allowing regres-
sion analyses that account for the "major" factors. *See e.g. Smith v. Vir-
ginia Commonwealth Univ.*, 84 F.3d 672, 676 (4th Cir. 1996) ("While
the omission of variables from a regression analysis may render the anal-
ysis less probative than it otherwise might be, it can hardly be said,
absent some other infirmity, that an analysis which accounts for the
major factors 'must be considered unacceptable as evidence of discrimi-
nation.' Normally, failure to include variables will affect the analysis'
probativeness, not its admissibility. Importantly, it is clear that a regres-
sion analysis that includes less than 'all measurable variables' may serve
to prove a plaintiff's case.")

tion select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle*, 422 U.S. at 425; *see also Dothard*, 433 U.S. at 329 ("[T]o establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern.").

I am of the opinion that Ms. Anderson satisfied her burden because Mr. Bradley's testimony is sufficient to show that the stages in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. In fact, the district court recognized that Dr. Bradley's analysis demonstrated a "statistically significant variation between the number of African-Americans who apply and the number who are successful at both the second and third step of the CBPS process." J.A. 12228. As the CBPS process is set up, all candidates who made it to stage two of the process possessed *at least* the minimum qualifications for the posted position. Further, all candidates who received a stage three interview were not only minimally qualified for the position in question, but were also found by the relevant department manager to be the *most qualified* of all applicants. Yet despite this, Dr. Bradley found a statistically significant under-representation of African-Americans when comparing the applicant pools to the successful candidates at the end of each stage.

Given these facts, I am at a loss to understand how the majority finds that Ms. Anderson's statistics fail to show that the stages in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. These statistics present more than just a disparity in Westinghouse's work force; they present evidence that the challenged stages have caused the exclusion of African-Americans because of their membership in a protected class. And this evidence, by virtue of the nature of the hiring process itself, controlled for the major factor in the hiring process that could be controlled for, namely that of qualification. For example, despite the fact that at stage three only the most qualified candidates are interviewed, Dr. Bradley found that African-Americans were under-represented in the class of those who actually received appointments after interviewing. I recognize that this court is under no obligation to "assume that plaintiffs' statistical evidence is reliable." *Watson*,

487 U.S. at 996. However, where a party shows that there is a statistically significant under-representation of African-Americans successfully completing a challenged subjective stage of a hiring process, despite a number of qualified African-American candidates,[4] I fail to see how an *inference* of causation for the purposes of establishing a prima facie case of disparate impact has not been shown.

Additionally, by faulting Ms. Anderson for not controlling for certain variables, the majority is in essence faulting her for not controlling for the exact factor that she is here challenging as causing a disparate impact — the subjective aspects of stages two and three. The majority states that "[f]actors such as presentation in the interview, answers to interview questions, demeanor, and ability demonstrated in the interview" are factors that entered in the ultimate hiring decisions, and that therefore in order to show causation any statistical evidence must control for these factors. *Ante* at 25. However, these are all subjective evaluations, and exactly what Ms. Anderson is challenging. The majority points out that Ms. Anderson did not account for the evaluation of core and functional competencies. But again, the evaluation of the core competencies, and any relevant functional competencies, is largely a subjective evaluation. While faulting Ms. Anderson for not controlling for these factors, the majority never explains how such control would even be possible. As I questioned earlier, how does one quantify "teamwork" or "leadership," such that it can be controlled for in a statistical setting. The very nature of the subjective process challenged makes such control impossible.

As such, because Ms. Anderson identified a specific practice, demonstrated the existence of a disparity and established a causal nexus between the two, I would hold that Ms. Anderson did in fact state a prima facie case of disparate impact.

### III.

Despite its belief that Ms. Anderson failed to satisfy her prima facie burden, the majority assumes arguendo that she has and continues with its disparate impact analysis. According to the majority:

---

[4]Especially at the third stage where all African-American interviewees were considered to be among the most qualified applicants.

> the question is whether the proffered circumstantial evidence of discriminatory impact is sufficient to satisfy the *McDonell Douglas* framework of proof . . . . Under this framework the plaintiff must first establish a prima facie case of discrimination. Then, the defendant must respond with evidence that it acted with a legitimate, nondiscriminatory reason. If the defendant makes this showing, then the plaintiff must "present evidence to prove that the defendant's articulated reason was pretext for unlawful discrimination."

*Ante* at 26. After noting that under *McDonnell Douglas* the ultimate burden of proving intentional discrimination remains on the plaintiff, the majority finds that Ms. Anderson failed to show that Westinghouse's legitimate nondiscriminatory reason was mere pretext for intentional discrimination.

In reaching this conclusion, the majority ignores the Supreme Court's decision in *Griggs*, the impact of which was to squarely reject the notion that in order to state a claim for employment discrimination the claimant must make a showing of intent. As the Court stated in *Griggs*, "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built in headwinds' for minority groups and are unrelated to measuring job capability." *Griggs*, 401 U.S. at 432.

Disparate impact and disparate treatment are two legally distinct causes of action under Title VII. Disparate treatment requires the plaintiff to prove that the defendant had discriminatory intent or motivation. *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988). In contrast, disparate impact seeks to ferret out employment practices that are the functional equivalent of intentional discrimination because they cause significant adverse effects on protected groups, but have no deliberate discriminatory motive. *Id.* at 986-87. It is important to note that while the Supreme Court has enunciated burden-shifting schemes for both disparate treatment and disparate impact, the schemes possess critical differences that prevents one from applying either test in the other context. *See* Lex K. Larson, *Employment Discrimination* § 8.01[2] (2d ed. 2004) ("The principal category of suits to which the *McDonnell Douglas* formula does not

apply is that exemplified by the 1971 case of *Griggs v. Duke Power Co.*"). As the Court noted in *Watson*, "[t]he factual issues and the character of the evidence are inevitably somewhat different when the plaintiff is exempted from the need to prove intentional discrimination." *Watson*, 487 U.S. at 987.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), sets forth the Supreme Court's burden shifting formula for dealing with the problem of proof in intentional discrimination cases.[5] Under the *McDonnell Douglas* burden shifting formula, after the plaintiff establishes a prima facie case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Should the employer articulate such a reason, the plaintiff must then be afforded an opportunity to show that the articulated reason was merely pretext for a racially discriminatory decision. *Id.* at 804-05.

By finding that Ms. Anderson had failed to show that Westinghouse's articulated reason was pretext, the majority in essence held that Ms. Anderson had failed to prove intent. However, in the context of her disparate impact claim, *Ms. Anderson was under no obligation to prove intent*. As the statute itself makes clear, where the employer demonstrates that the challenged practice is job related for the position in question and consistent with business necessity, the plaintiff may still prevail by showing the existence of an equally effective alternative practice that eliminates the disparate impact and that the employer refuses to adopt that alternative. 42 U.S.C. § 2000e-2(k)(1)(a)(2). Nowhere does the statute require a showing of pretext, because pretext points to intent. Therefore, the majority's application of any such burden to Ms. Anderson is error.

---

[5]*See* Lex K. Larson, *Employment Discrimination* § 8.01[1] (2d ed. 2004) ("Employers are, on the whole, too sophisticated to profess their prejudices on paper or before witnesses. The Supreme Court in *McDonnell Douglas*, recognizing the necessity in most instances of reliance on circumstantial evidence, laid down rules of proof under which direct evidence of discriminatory intent is not necessary to the making of a prima facie case.").

IV.

Disparate impact is more than a mere method of smoking out intentional discrimination. Disparate impact attacks a set of deleterious behaviors that the intent standard fails to capture. By definition, the standard attacks only those practices that have a disparate impact on the employment opportunities of classes protected by Title VII when those practices are not supported by a legitimate business justification or where the same end-goals can be achieved in a less deleterious manner. Given the struggles of this nation, a practice that has a disparate adverse impact on a protected class, and yet either has no legitimate business justification, or can be achieved in a less harmful manner, is not a practice that we should allow to stand. Ultimately, this is a recognition by society that these practices, and their effects, are harmful in their own right. To continue moving a healing society forward, any such practices must be attacked under Title VII with a level of vigor equal to that spent combating intentional discrimination.

With its holdings today, the majority has made the mountain a plaintiff must climb to state a disparate impact claim harder to surmount. Not only has the majority in essence required the plaintiff here to prove causation to a scientific certainty, they have also forced the plaintiff to show intent despite the clear statutory and jurisprudential dictates to the contrary. As I cannot concur with either of these results, I respectfully dissent.