WILKINSON, Circuit Judge,
dissenting:
I thank my colleagues for their thoughtful opinion, but I must respectfully dissent. Because the record in this case provides no reasonable basis to infer that the Department’s reasons for not promoting Wesley were false, much less that the actual reason was race or sex, her claims must fail. In remanding for trial, however, the majority unfortunately assumes the role of “super-personnel department weighing the prudence of employment decisions.” DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir.1998) (internal quotation omitted).
The Department produced three legitimate non-discriminatory reasons for not promoting Wesley: relative to the other candidates, she had less operations experience, less technical skill, and a less distinguished record of prior performance. To prevail, Wesley must be able to show not only that these reasons are false but also “that discrimination was the real reason.” St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
First of all, there is no dispute that Wesley had fewer total years in operations than the candidates who were promoted and that this factor was discussed at the roundtables. Operations experience refers to time spent serving on the crews of fire trucks or ambulances. The majority attempts to minimize this uncontroverted fact by noting that Wesley was said by one senior officer to have as much experience on fire trucks (as opposed to ambulances) as some of the candidates who were promoted. But this testimony is neither here nor there. He did not dispute that the Department did, in fact, base its decision on Wesley’s relative lack of total operations experience. Rather, he simply disputed whether, in his judgment, the Department should have based its decision on that fact. But “[w]e cannot require that different supervisors within the same organization must reach the same conclusion on an employee’s qualifications and abilities.” Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir.2005).
There is also no dispute that Wesley knew that her superiors wanted her to gain more experience in operations, that she chose to remain in non-operations positions despite their concerns, and that her choice was discussed at the roundtables. The majority attempts to discount these facts by stating that it was “entirely rea *784 sonable” for Wesley to remain in her non-operations job at the training academy. Maj. Op. at 781. But whether or not the decision seemed reasonable from Wesley’s perspective is irrelevant. “[W]e have repeatedly explained that it is the perception of the decision maker which is relevant.” DeJarnette, 133 F.3d at 299 (internal quotation and alteration omitted). And from the Chiefs perspective, Wesley declined the opportunity to obtain the very experience that she knew was necessary to put herself among the top candidates for Captain.
The majority seeks to downplay the importance of operational experience by pointing out that “not every” captainship required such experience. Maj. Op. at 781-82. But it is not racial or sexual animus for a fire chief to want captains who are fully capable of assuming operational duties on fire trucks or ambulances, which, after all, is what the Department is about. The majority further attempts to discount Wesley’s relative lack of operations experience by noting that she did eventually return to operations. But Wesley returned to operations for only sixteen months before choosing to transfer back to a non-operations position. During her return, she was involved in three vehicle accidents between April and June of 2002 and consequently received an unsatisfactory rating on a key element of her job performance. Moreover, the short duration of her return was discussed at the roundtables.
Turning to the Department’s second reason, it is undisputed that the candidates promoted had at least one of the following certifications: advanced life support (ALS), hazardous materials, or technical rescue. Wesley, however, had none of these. The majority states that “participants of the roundtables dispute whether the Fire Chief ever discussed these certifications during these sessions.” Maj. Op. at 781 (citing J.A. 228). To be sure, two roundtable participants did not recall whether “special consideration” was given to candidates who were paramedics, i.e. those who held ALS certification. J.A. 228, 312-13. But those two participants did not deny that ALS or other certifications were discussed and thus given some consideration. Indeed, the whole point of the roundtables was to discuss such matters. At most, there is a question about how much weight was given to a particular certification, but there is no question that Wesley lacked that certification.
The majority’s real concern seems to be that the Chief did not give enough weight to Wesley’s other qualifications. In its view, the Chief valued other candidates’ “marginally relevant” qualifications but disregarded Wesley’s “seemingly pertinent” ones. Maj. Op. at 782. I do not understand how the majority distinguishes between the “marginal ]” and the “pertinent.” Among the “marginal! ],” it places one candidate’s leadership role in an inter-jurisdictional task force, which according to the Chief, “required [the candidate] to manage complex personnel and technical situations.” J.A. 30. But among the “pertinent,” it places Wesley’s experience in public relations. More generally, as the majority rightly acknowledges, “it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason.” DeJarnette, 133 F.3d at 299 (internal quotation omitted). The mere fact that the majority would weigh certain undisputedly relevant qualifications differently is hardly a reason to infer that the Department is prevaricating- — much less discriminating on the basis race or sex.
Turning to the Department’s third reason, it is undisputed that Wesley had a relatively spotty performance record, that the Chief was aware of her record, and *785 that her record was discussed at the roundtables. The majority, however, faults the Department for offering “shifting explanations.” Maj. Op. at 782. To establish this, it compares the Department’s interrogatory responses to the Chiefs deposition. In its interrogatory responses, the Department listed several instances of unsatisfactory performance from Wesley’s personnel records. These included a 1997 incident in which Wesley performed poorly as a pump operator and then showed little initiative to improve and a 1999 incident in which she was involved in a vehicle accident while responding to a call. To be sure, the Chief later stated that, while he was aware of these two particular incidents, he probably deemed them too stale for his consideration. But his statement is not a reason to infer that the Department has been offering shifting explanations. The Department never claimed that Wesley was not promoted because of one or two particular incidents. Rather, it consistently maintained that she was not promoted because of her general reputation for poor performance — most recently reinforced by her involvement in three vehicle accidents in 2002. Indeed, the interrogatory response in question does not purport to say that the 1997 and 1999 incidents were major factors in the Chiefs decision; instead, it points to them only as part of a “persistent pattern of concerns” about Wesley’s performance. J.A. 99. If there is any inconsistency at all between the interrogatory responses and the Chiefs statement, it is negligible. It goes only to which of the various instances of poor performance in Wesley’s past stood out the most to the Chief — not to whether he was aware of the instances at the time of his decision or whether he ever wavered in his overall assessment that her performance was poor.
In its continuing effort to portray the Department’s explanations as “shifting,” the majority also points out that the Department submitted an affidavit late in the litigation from a training recruit who stated that Wesley fell asleep during classes she was supposed to be teaching and lacked knowledge of basic concepts. It is hard to see how this affidavit is evidence of an inconsistent explanation, given that the Fire Chief and several battalion chiefs had previously stated in their affidavits that such concerns were raised at the roundtables. To be sure, two panel participants did not recall these concerns being discussed. But to label the Department’s position as shifting because of the recruit’s affidavit, as the majority does, is simply incorrect.
The majority attempts to bolster its argument that the Department did not actually base its decision on Wesley’s spotty performance record by pointing out that the Fire Chief promoted someone to Captain in 2002 despite an even spottier record. It is telling that the majority must reach outside of the limitations period for Wesley’s suit to find someone who was promoted with a record that was arguably worse than hers.* It does not point to a single blemish in the personnel files of the six individuals promoted during the period of her suit, despite the fact that those files are in the record. See J.A. 400-768. Nor does it contend that Wesley matched up against those who actually received the promotion. What is more, the majority fails to note that the position of Fire Chief was held by a different individual in 2002 than in the period covered by Wesley’s suit. That the new chief may have taken past performance more seriously than his *786 predecessor is no reason to infer that he discriminated against Wesley.
The majority suggests that it is merely respecting the “province of the jury” by declining “to weigh the credibility of witnesses and evidence on contested issues of fact.” Maj. Op. at 782-83, n. 9. But this argument misses the point. The only thing in dispute here is whether the Chiefs decision was wise or not — a point which can be debated with respect to every single decision to promote but which is not a material issue under Title VII. The majority does little more than second-guess the Fire Chiefs decision, but it is not our role nor within our competence to do so. This is especially true where, as here, the position involved is critical to public safety and demands a very specialized skill set. The Captain of a fire truck must not only possess technical capabilities and extensive experience but also command the respect of his or her team. Otherwise, the morale and efficiency of that team may crumble, resulting in serious injury to both persons and property.
I recognize that historically the officer ranks of fire and police departments have not been as open to minority and female officers as they should have been. And yet, as the district court noted and the majority does not contest, the Department has in recent years promoted well-qualified African-Americans and women to various positions at rates comparable to the rates for white males. See Wesley v. Arlington County, 2008 WL 4774480, at *3 (E.D.Va. Oct.24, 2008). This case is, however, regrettably weak. The promotion in question should be earned at the station-house — not the courthouse. With full respect for my able colleagues, I would affirm the judgment of the district court.

 Under the statute of limitations, Wesley’s suit covers only the period from October 2004 to August 2005, during which the Department promoted six individuals. Wesley v. Arlington County, 2008 WL 4774480, at *4 (E.D.Va. Oct.24, 2008).